IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YOLANDA BZDYK, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SHEET METAL WORKERS LOCAL 265 ) <br> WELFARE FUND, ) <br> ) <br> Defendant. ) | Case No. 10-CV-4352 <br><br> Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Sheet Metal Workers Local 265 Welfare Fund's ("Defendant" or "Fund") motion for summary judgment [11]. For the reasons stated below, the Court grants Defendant's motion [11].

**I.     Standard of Review**

Plaintiff's claim is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, which was "enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). The statute permits a person who is denied benefits under an ERISA employee benefit plan to challenge that denial in federal court. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); see also 29 U.S.C. § 1132(a)(1)(B). In moving for summary judgment, Defendant asks the Court to determine the question of Plaintiff's eligibility for certain benefits based on the Fund's Health and Welfare Plan, Plaintiff's medical records, the Fund's initial decision and decision on appeal, and the deposition of Dr. Loftin, one of the medical consultants employed by the Fund who reviewed

Plaintiff's eligibility for benefits. Generally, "[t]he standard of review of a Plan Administrator's decisions regarding benefits depends on whether the Plan Administrator was given the discretion to make those decisions." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 629 (7th Cir. 2004). The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Both sides agree that the appropriate standard for the Court's review of Defendant's benefits determination is whether the plan administrator's decision was arbitrary and capricious.

## II.  Facts

The Welfare Fund is a joint labor-management trust fund established pursuant to collective bargaining for the purpose of providing welfare benefits to persons employed under various collective bargaining agreements. The Welfare Fund is administered by a Board of Trustees, employs a staff of people to perform services to accomplish the Fund's objectives, and maintains an office for the conduct of regular business operations in Carol Stream, Illinois.

The principal document governing the operation of the Welfare Fund is the Health and Welfare Plan, as from time to time amended. At all relevant times, the Health and Welfare Plan has contained certain provisions governing the administration of the Fund. Specifically, the Plan provides that:

> Only the Board of Trustees has the authority to determine eligibility for benefits and the right to participate in the Plan and to exercise all the other powers specified in the Plan. The Trustees may, in their sole and broad discretion, modify, amend, or terminate the Plan in any matter or at any time. No officer, agent, or employee of the Union or Employer or any other person, is authorized to speak for, or on behalf of, or to commit the Board of Trustees, on any matter relating to the Health and Welfare Fund or Plan.

2

> The Trustees also decide any factual question related to eligibility for and the type and amount of benefits. The decision of the Trustees is final and binding and will receive judicial deference to the extent that it does not constitute an abuse of discretion. If a decision of the Trustees is challenged in court, the decision will be upheld unless the court finds that it is arbitrary and capricious.

The Welfare Plan identifies the Board of Trustees of the Welfare Plan as both the Plan Sponsor and Plan Administrator.

On or about February 1, 2008, Plaintiff Yolanda Bzdyk, a participant in the fund, had an office visit with her reproductive specialist, Dr. Zvi Binor, at Rush-Copley Center for Reproductive Health. Plaintiff's medical records demonstrate a long-standing history of fertility-related issues. Between February 2008 and May 2008, Plaintiff and her husband visited Rush-Copley for various fertility-related tests. Then, on July 18, 2008, she underwent a diagnostic laparoscopy, during which Dr. Zvi Binor excised lesions and removed ovarian cysts. The "Report of Operation" noted that endometriosis appeared in the bladder flap and that pelvic endometriosis was identified on the ovary. The report also states that "[f]ollowing the lavage of the pelvis and fulguration of the endometriosis, the procedure was terminated." Plaintiff's medical records from July 18, 2008, state that she has "a history of endometriosis in the pelvis with adhesions." The records also indicate that she "underwent 2006 laparoscopy/hysteroscopy for endometriosis, lysis of adhesions on the left adnexa, removal of left tubal cyst, and small uterine fibroids as well." Plaintiff also complained of abdominal pain (which can be caused by pelvic adhesions and endometriosis) in the pelvis prior to July 18, 2008. In her statement of facts, Plaintiff admits that the surgery performed on July 18, 2008, would not have been performed in the absence of infertility. Pl.'s SOF ¶ 24.

Upon receipt of the claims for these visits, the Fund Office sent the claims to a medical consultant to determine whether the services were related to infertility.[1] The medical consultant found the services related to the treatment of infertility. Based upon the medical consultant's opinion, the Fund Office denied the claims because the participant's infertility treatment benefits maximum had already been exhausted. The Sheet Metal Workers Local 265 Health and Welfare Summary Plan Description includes a summary of benefits chart which provides that the Plan limits major medical benefits benefits for infertility treatment to $25,000 per family per lifetime. Major Medical Covered Expenses include: "For Class A, E, G, H, and I Eligible Employees and Dependent Spouses only, infertility treatment, up to the Plan's limits, for office visits, x-ray and lab, prescription drugs, drug/hormone therapy, and Surgical Procedures for infertility."

On March 10, 2009, Plaintiff's husband, Mark Bzdyk, wrote a letter to the Fund stating that the treatment at issue was for endometriosis, a gynecological condition. Mr. Bzdyk also enclosed a letter from Plaintiff's physician, Dr. Binor Zvi, which stated that Plaintiff had presented in his office with "increasing pelvic pain symptoms" and that the procedure was done to treat endometriosis. The letter also stated that "[w]hile the procedure can improve her overall fertility, it was done to treat endometriosis, which as you know, is a gynecological condition." Upon receipt of Mr. Bzdyk's appeal, the Fund Office sent the claims and relevant documentation to a second medical consultant, Dr. Eugene Loftin, to determine whether the services were related to the treatment of infertility. Dr. Loftin concluded, "Based on the information received,

---

[1] The consultant who provided the first opinion has been in active practice since 1978 and is board-certified in obstetrics and gynecology, with added qualifications in reproductive endocrinology. He is a member of the American Society for Reproductive Medicine, the Society of Assisted Reproductive Technology, the Endocrine Society, the Society of Reproductive Surgeons and the John Kelly Society. The consultant also has served as an assistant professor, instructor and clinical fellow in obstetrics and gynecology at the university level and currently is on staff at more than one hospital.

review of the scientific evidence, other outside authority, and my own experience, the treatment/charges are all infertility related."

During his deposition, Dr. Loftin stated that he was aware that Dr. Binor had said that the "patient has some pelvic pain as well," but Dr. Loftin was of the opinion that the pain was "hardly the reason she presented." He also testified that he is familiar with endometriosis, pelvic adhesions, and laparoscopic procedures, and he further testified that if endometriosis "is severe enough" or if pelvic adhesions need treatment, a laparoscopic procedure could be performed. Specifically, he agreed that if a doctor suspects or has a patient that has severe endometriosis or severe pelvic adhesions, a laparoscopy would be appropriate for diagnostic purposes and special tools would be used to address problems identified. He also agreed that if a patient "presented with primary complaint of pain unrelieved by conservative medical management and she goes to her regular gynecologist, this would be something we would consider medical/surgical treatment." Finally, he testified that laparoscopy can cauterize or burn out endometriosis.

On May 7, 2009, the Board of Trustees considered Mr. Bzdyk's appeal and the Fund's file on the claims at issue. Based on the two independent medical consultants' opinions that the treatment at issue was related to infertility, and that Ms. Bzdyk has already exhausted the Plan's available benefits, the Board of Trustees upheld the administrative manager's denial of the claims and explained the reasoning in a written Appeal Decision. On May 22, 2009, the Welfare Fund sent Mr. Bzdyk a copy of the Appeal Decision.

## III. Analysis

### A. Preemption

In her complaint, Plaintiff asserts state law claims for breach of contract and bad faith. Defendant contends, and Plaintiff does not contest, that Plaintiff's state law claims all relate to an

ERISA-governed plan, and therefore are preempted. Indeed, ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "State laws" includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). A state law claim "relates to" an ERISA plan, and is thus preempted, "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983); see also *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48 (1987). In *Pilot Life Insurance Co.*, the Supreme Court held that ERISA preempts state common law tort claims and breach of contract claims, including bad faith claims, "based on alleged improper processing of a claim for benefits under an employment benefit plan." *Id.*; see also *Smith v. Blue Cross Blue Shield of Wisconsin*, 959 F.2d 655, 657 (7th Cir. 1992). As the Supreme Court noted in *Aetna Health Inc. v. Davila*, 542 U.S. 200, 216 (2004), "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."

Here, Plaintiff's claims clearly "relate to" an ERISA plan. In fact, all of Plaintiff's claims are predicated upon Defendant's failure to pay benefits according to the terms of the Welfare Plan and resolution of the breach of contract claim necessarily requires the Court to examine the Plan terms. Similarly, using the same analysis, the bad faith claim requires the Court to inquire into the Plan's terms to assess Defendant's alleged liability. Claims for relief that are "based on alleged improper processing of a claim for benefits under an employee benefit plan undoubtedly meet the criteria for preemption." *Morstein v. National Ins. Servs., Inc.*, 93 F.3d 715, 720 (11th Cir. 1996) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48 (1987)); see also *Smith*, 959 F.2d at 657.

### B. Review of the Administrator's Decision

Review under the deferential standard—whether the administrator's decision was arbitrary and capricious—"is not a rubber stamp" (*Holmstrom v. Metropolitan Life Ins. Co*., 615 F.3d 758, 766 (7th Cir. 2010)), and courts should not uphold a termination "when there is an absence of reasoning in the record to support it" (*Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 774-75 (7th Cir. 2003). The Seventh Circuit has advised district courts to focus on "procedural regularity, substantive merit, and faithful execution of fiduciary duties" in considering whether an administrator decision was arbitrary and capricious. *Holmstrom*, 615 F.3d at 766. The fundamental question before the Court is whether it was reasonable for the Fund to conclude, under the terms of its Welfare Plan, that Plaintiff's treatment on July 18, 2008, was related to infertility. Under the deferential standard of review, "an administrator's interpretation is given great deference and will not be disturbed if it is based on a reasonable interpretation of the plan's language." *Wetzler v. Illinois CPA Soc. & Foundation Retirement Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009).

Plaintiff maintains that Defendant failed to consider the purpose of the treatment at issue and instead based the decision solely on the basis of Plaintiff's medical provider's specialty. In support of her position, Plaintiff explains that the treatment at issue (a laparoscopy) can treat both pain associated with endometriosis and pelvic adhesions as well as infertility. Accordingly, Plaintiff maintains that it was irrational for Defendant's medical consultants to conclude that the surgery was performed to treat infertility and not pain in this case, particularly given that Plaintiff had previously undergone a laparoscopy that identified the presence of endometriosis and pelvic adhesions and Plaintiff's treating physician noted the presence of pain. Plaintiff also maintains that the decision in this case was made "for the wrong reasons," in that the Fund relied

upon the reports of two medical consultants who ignored substantial evidence and rendered decisions that were not based on the medical evidence.

Contrary to Plaintiff's claims, a review of the record demonstrates that both medical consultants considered the relevant medical records, including, and most importantly, her doctor's notes from the day on which the surgery was performed. Initially, the Fund sent the Plaintiff's medical records to Medical Review Institute of America, Inc. for an opinion regarding whether the claims at issue related to a medical condition or infertility. The medical consultant's report included the following under the heading "Brief Summary of Treatment/Case History":

> This case involves a 36 year-old patient with a long standing history of infertility. She had previously undergone a laparoscopy that identified the presence of endometriosis and pelvic adhesions. She has undergone intrauterine inseminations with Clomid and an IVF cycle. A recent hysterosalpingogram demonstrated left distal tubal occlusion. In addition, due to the "luteinized unruptured follicle pattern of [her] ovulation induction" recurrence of endometriosis was suspected.

Def. Ex. 3. The first medical consultant then explained why he concluded the treatment was related to infertility: "This patient has a long-standing history of infertility with previous tubal occlusion and endometriosis. There is no documentation of chronic pelvic pain or treatment of any kind in that regard. The surgery performed on 7/18/08 was strictly for the purpose of addressing her infertility issue. This surgery, in the absence of infertility, would not have been performed." *Id*. Contrary to Plaintiff's contention, the consultant's report shows that the physician considered whether "chronic pelvic pain or treatment" was documented in the medical records and noted that there was "no documentation" reflecting chronic pain; rather, the records contained only one reference on the date of the surgery to "some pelvic pain as well."

In response to the first medical consultant's opinion dated January 5, 2009, on March 3, 2009, Plaintiff's treating physician sent a follow-up letter in which he stated that Plaintiff

presented "with increasing pelvic pain symptoms, worsening of endometriosis condition was suspected, and for that reason a diagnostic laparoscopy was planned." The letter noted that while "the procedure can improve her overall fertility, it was done to treat endometriosis, which as you know, is a gynecological condition." Yet it was not until after (i) the first medical consultant pointed out that the medical records did not document complaints of chronic pain and (ii) the claims were denied as not covered under the terms of the Welfare Plan, that Plaintiff's treating physician stated that the treatment was done in response to "increasing pelvic pain symptoms."

The Fund submitted all of the documentation, including the treating physician's March 3, 2009 letter, to a second medical consultant called to obtain a second opinion. Dr. Loftin considered the evidence from the treating physician and the first medical consultant and reported his findings as follows:

> [Plaintiff] is a 36 year-old woman who saw her reproductive health specialist February 1 2008 with a history of "delivery in 2003 and hysteroscopy that showed left tubal occlusion at (the) proximal portion and cervical stenosis." In 2008 "she underwent laparoscopy/hysteroscopy for endometriosis, lysis of adhesions on the left adenexa, removal of left tubal cyst, and small uterine fibroids as well." After a multiplicity of medical treatment to induce fertility failed a repeat hysterosalphingogram was done. Distal Fallopian blockage was documented. Right sided induction of ovulation failed following that. As Ms. *** has "some pelvic pain as well," "diagnostic laparoscopy with possible fulguration of endometriosis and lysis of additional adhesions" was recommended.

Dr. Loftin's "peer review recommendation" stated as follows:

> Based on the information received, review of the scientific evidence, other outside authority and my own experience the treatments/charges are all infertility related.
> 1.     Ms. *** presented for treatment for infertility.
> 2.     Ms. *** was treated for infertility.
> 3.     "Some pelvic pain as well" went to surgery as the infertility treatment had failed.
> 4.     The issue of "some pelvic pain as well" was not the focus of presentation or treatment.
> 5.     "Some pelvic pain as well" is reasonably expected to occur with the conditions causing Ms. *** to be infertile.
> These procedures should be processed under the infertility benefits.

      a.       58662: Laparoscopy, excise lesions
      b.       58345: Reopen fallopian tube

In sum, both of the medical consultants' reports support the conclusion that they considered all of the evidence, including the Plaintiff's pain, before concluding that the procedure was performed to treat infertility. The consultant's did not ignore substantial evidence; rather, they reviewed the evidence and reached a different conclusion than that urged by Plaintiff and her treating physician.

In fact, both the first medical consultant and Dr. Loftin reviewed the following report from Plaintiff's treating physician describing the Plaintiff as a patient who presented with a primary diagnosis of infertility:

> The patient is a 36-year-old Caucasian female that had been seen in our office for the last six months. She has a history of delivery in 2003 and hysterosalphingography that showed left tubal occlusion at proximal portion and cervical stenosis. The patient underwent 2006 laparascopy/hysteroscopy for endometriosis, lysis of adhesions on the left adnexa, removal of left tubal cyst, and small uterine fibroids as well. Husband underwent varicocelectomy in 2002 with evidence of high level of white blood cells. The patient underwent a variety of treatment from induction of ovulation, insemination, and in vitro fertilization. She has been married seven years and has regular cycles. Her evaluation included a repeat hysterosalpingography that showed normal uterus with no filling defect, fill of tube on the left was no spill and the right tube was spilling. The patient has tried to undergo induction with rightsided ovulation due to the fact that the tube on the left was not proximally occluded, but distally. Suspected issue was related to potential adhesions in the pelvis. Her Clomid challenge test as well as an anti-Mullerian hormone were normal indicating a normal ovarian reserve. There was a history of endometriosis in the pelvis with adhesions and thoughts of laparoscopy were introduced to the patient early in the work up. Due to the luteinized unruptured follicle pattern of the outcome of induction of ovulation, suspicion of endometriosis had been brought as this condition linked to endometriosis. At this point, the patient has some pelvic pain as well as the above findings, and what was presented to the patient was to undergo diagnostic laparoscopy with possible fulguration of endometriosis and lysis of additional adhesions that may be in the pelvis. The patient understands that plan and agrees with it.

Dr. Loftin testified that the excerpt from Plaintiff's medical records quoted above supports the conclusion that Plaintiff presented to her treating physician with infertility and was in need of additional infertility treatment. Dr. Loftin also testified that he "realize[d]" that Dr. Zvi was saying that Plaintiff had "some pelvic pain as well," but opined that that was "hardly the reason she presented."

Plaintiff contends that, during his deposition, Dr. Loftin testified that a laparoscopy would be appropriate medical treatment for pain caused by endometriosis and pelvic adhesions in contradiction to the first medical consultant's opinion.[2] However, Plaintiff cited to Dr. Loftin's deposition testimony concerning a hypothetical patient with "severe endometriosis or pelvic adhesions" and who "presented with primary complaint of pain unrelieved by conservative medical management" as support for her argument that Dr. Loftin's opinion contradicted the first medical consultant's opinion. Here, by contrast, the evidence does not support an assertion that Plaintiff had "severe" endometriosis or pelvic adhesions or "presented with primary complaint of pain unrelieved by conservative management." Instead, the medical records note a long-standing history of infertility problems, accompanied by "some pelvic pain."

---

[2] It is questionable whether Dr. Loftin's deposition is relevant to this dispute. "When review is deferential – when the plan's decision must be sustained unless arbitrary and capricious – *then* review is limited to the administrative record." *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) (citing *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975 (7th Cir. 1999)); see also *Glenn*, 128 S. Ct. at 2348. As previously set forth, in this case, the arbitrary and capricious standard applies. However, even when the arbitrary and capricious standard of review applies, the Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008), seems to implicitly permit limited discovery in order for the Court to properly weigh the structural conflict as a factor in its review of Defendant's decision. See, *e.g.*, *Baxter v. Sun Life Assur. Co. of Canada*, 713 F. Supp. 2d 766, 768-73 (N.D. Ill. 2010) (discussing cases). However, in the present case, the Court need not delve too far into this inquiry, because the Court finds that Dr. Loftin's testimony, even if relevant to the dispute, does not weigh against or contradict the Trustee's decision; if anything, it demonstrates that he considered Plaintiff's medical records and drew a rational connection between the evidence, the issue presented, and the conclusion reached.

Accordingly, Dr. Loftin's testimony does not directly contradict the findings of the first consultant.

Based on the Court's review of the record, Dr. Loftin's conclusion that Plaintiff's treatment was related to infertility was not arbitrary and capricious; rather, he explicitly considered Dr. Zvi's notation that she presented with "some pelvic pain" in the context of her long history of infertility and concluded that the infertility was the driving force in her decision to undergo a laparoscopy, not "chronic" pelvic pain as suggested by Plaintiff. This conclusion is further supported by Plaintiff's own admission that "[t]he surgery performed on July 18, 2008 would not have been performed in the absence of infertility." Pl.'s SOF ¶ 24. Furthermore, even in light of medical records demonstrating "dual benefits" of the July 18, 2008 surgery, it was not downright unreasonable for Defendant, particularly after consulting with two medical professionals, to conclude that Plaintiff's surgery was part of her ongoing infertility treatment. See, e.g., *Stonich v. Continental Cas. Co.*, 2006 WL 752939, at *2 (N.D. Ill. Mar. 20, 2006) (finding a "rational connection" between administrator's decision to deny benefits for fertility-related treatment and plan documents); see also *Zeidler v. United Food and Commercial Workers Union*, 1995 WL 769177, at *4-5 (N.D. Ill. Dec. 29, 1995) (finding that administrator's decision to deny benefits for laparoscopies was not arbitrary and capricious).

Plaintiff also maintains that Dr. Loftin ignored evidence supporting the conclusion that the procedure may have been performed to treat a medical condition because the treating physician is a reproductive health specialist. But Dr. Loftin never testified that he did not credit evidence in Plaintiff's records because of the provider's specialty. Additionally, he did not merely rely on Dr. Binor's status as a reproductive health specialist. Instead, he reviewed the medical records, including the records from Plaintiff's own physician which point out that

Plaintiff presented with a primary diagnosis of infertility and that she was seen for six months for infertility treatment leading up to the July 18, 2008 surgery. These records fail to cast Dr. Loftin's decision in a "downright unreasonable" light.

A final note regarding structural conflicts of interest. A structural conflict of interest may come into play where the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay those benefits. *Glenn,* 554 U.S. 105, 111 (2008); *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009). "A structural conflict is one factor among many that are relevant in the abuse-of-discretion analysis * * * and will 'act as a tiebreaker when the other factors are closely balanced.'" *Raybourne,* 576 F.3d at 449 (quoting *Glenn,* 554 U.S. at 117). In such cases, like the present one, the conflict of interest is "weighed as a factor in determining whether there is an abuse of discretion."[3] See *Glenn,* 554 U.S. at 111 (internal quotations omitted).

A detailed analysis of any potential conflict of interest at work here is unnecessary, as the Court finds that the administrator's decision is rationally supported by evidence in the record. See *Black v. Long Term Disability Insurance*, 582 F.3d 738, 748 (7th Cir. 2009). That being said, the Court briefly comments on some of the factors present in this case that suggest that a conflict of interest likely was not at work. See, *e.g.*, *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 777 (7th Cir. 2010). First, Defendant's decision to use a medical consultant in making its initial determination cuts against the possibility of a conflict of interest. The medical consultant reviewed external documents—Plaintiff's medical records and, in particular, her

---

[3] For ERISA purposes, "the arbitrary-and-capricious standard * * * is synonymous with abuse of discretion * * *." *Raybourne v. Cigna Life Ins. Co. of New York,* 576 F.3d 444, 449 (7th Cir. 2009). The Seventh Circuit recently noted that while "[n]it-pickers might argue that there is a distinction between the two standards, but they are simply different ways of saying the same thing." *Holmstrom*, 615 F.3d at 767 (quoting *Jenkins,* 564 F.3d at 861 n.8) (internal quotation marks omitted).

doctor's notes from the day of the surgery—prior to rendering his opinion. Additionally, the decision to seek a second opinion prior to issuing a decision on Plaintiff's appeal also undercuts a finding that the conflict of interest played a role in Plaintiff's case. Dr. Loftin not only reviewed Plaintiff's medical records but also reviewed her treating physician's letter, which contained additional information regarding the treatment, prior to rendering his decision.

In sum, nothing in the undisputed facts suggests that the decision in this case was anything other than impartial. The issue on which the decision turned—whether the surgery was for treatment of infertility—was not a complex one analytically, but presented the difficulties inherent in determining a fact when medical professionals are presenting differing opinions on those facts. The process afforded Plaintiff included an initial decision and an appeal, during which Plaintiff was able to present a letter from her treating physician in support of her position. Additionally, the Fund sought and made its decision in accordance with the opinions of two outside medical consultants, who based their opinions on a review of Plaintiff's medical records. And finally, Defendant's ratiocination for the denial— that Plaintiff's laparoscopy, performed while she was a patient and undergoing treatment for infertility at the Rush-Copley Center for Reproductive Health, was to assist her infertility problems and she already had exhausted her infertility treatment benefits maximum—was sound.

## IV. Conclusion

Because the Court finds that Defendant's decision to deny benefits was not arbitrary and capricious, the Court grants Defendant's motion for summary judgment [11] and enters judgment in favor of Defendant Sheet Metal Workers Local 265 Welfare Fund and against Plaintiff Yolanda Bzdyk.

Dated: August 22, 2011

Robert M. Dow, Jr.
United States District Judge